Mr. Justice CATRON
delivered the opinion of the court.
The United States sued the Bank of the United States for a dividend on stocks held by'the government in the bank, and the defendant pleaded-and relied in defence on a set-off, being the .damages, claimed .by the defendant of fifteen per cent, on a protested draft in the form of a bill of exchange, drawn by the government of the United States on the government of France, for a. Sum of money due from the latter government to the former, by treaty stipulations, to obtain possession of which the. draft was drawn. The bank was the payee and original holder. The *395 holders at the time of protest (Messrs. Rothschilds of Paris) caused it .to be protested for non-payment; and Hottinguer & Co. intervened immediately after, and took up the draft for the honor of the bank. The corporation refunded to Hottinguer & Co. the amount advanced, including interest and charges, together with one half per cent, commissions, and thus again became possessed of the draft.
The Circuit Court, on a former trial, held that the damages claimed as a set-off depended on a statute of Maryland of 1785 ; that by the statute the holder at the time of protest alone could demand damages ■ from any previous party to a bill, and that if he failed to do so, and recovered less from any previous indorser, the latter could only recover the amount actually paid (with interest and charges, accruing subsequently) from the drawer ; and therefore the bank could set up no claim by force of the statute of Maryland, taking its own assumption to be true, that this was a legal bill of exchange, and properly subject to protest. This instruction altogether rejected the defence relied on, and the jury found for the plaintiffs; and from that decision the defendants prosecuted a writ of error to this court. When the cause came* before us in 1844 (2 Howard, 711), this single question was presented for our determination ; nor could this court decide any other question ; and such was the unanimous opinion of the court,,although the judges then present differed as regarded the true construction of the .statute of Maryland ; the majority holding the construction of the Circuit Court to have been erroneous, and .that the bank, as payee, on taking up the draft from Hottinguer & Co., had the same right to -demand damages under the statute that the holder had at the time of protest. The court, however, when giving its opinion, threw out some suggestions on the structure of the bill; first remarking, that, “before we consider the rulings of the court excepted to, it may not be improper to notice the structure of the bill, which has been much comménted on by the counsel^ though, not having been excepted to by the government, it is not a matter for decision.” The instruction given cut off every other question the government might have raised in opposition to the set-off claimed ; and as this court, when acting as a court of errors, can only legitimately revise the questions of law that have been raised and decided in the Circuit Courts, it must of necessity, orí a second writ of error being prosecuted, have power to revise such rulings of the court below on the second trial as affect the merits of the. controversy, and to pass on the questions not previously presented, as open questions, in the particular cause. However high the regard of judges that did not conóur may be for the views entertained and expressed by other judges, on a question of law not brought up for decision, still it is impossible to recognize such views as binding authority, consistently with the due administration of justice ; as by doing so the merits of *396 .the controversy might be forestalled, without proper examination. We therefore feel ourselves at liberty to treat of th,e structure and character of the instrument before us as an open question. And so, also, we deem the question open, whether the statute of Maryland subjected to protest and damages a government. The statute provides, — “That upon all bills of exchange hereafter drawn in this State on any person, corporation, company, or society in any foreign country, and regularly protested, the owner’or holder of such bill shall have a right to so much money as will purchase a good bill of the same time of payment, and upon the same place, at the current rate of exchange of such bills ; and also fifteen per cent.' damages upon the value of the principal sum mentioned in such bill, with costs of protest, together with legal interest,” &c. The United States refunded to the bank, on the return of the draft, the principal sum, together with all the charges actuálly incurred by the bank, and the interest accruing from the date of drawing to the time when the money was refunded ; but refused to pay the fifteen per cent, damages claimed by the bank. This refusal was not founded on the true construction of the Maryland statute ; the government insisting it had- no application to the transaction, but that the drawing was of nation upon nation, and not governed by the láw merchant ; and that the form of one of the instruments making up the transaction did not and could not alter its character or legal effect, so as to bring it within the law merchant. That the government was only bound to do equity to the bank to the extent of the amount refunded to Hottinguer & Co. "And .these conflicting assumptions make up the question we are now called on to determine, as will be seen by referring to the third and fourth instructions asked to be given to the jury, on part of the plaintiffs, on .the second trial; they are as follows : —
“ 3. That the- bill in question, being drawn by one government upon another, and upon' a párticular fund, is not a bill of exchange within the legal meaning of the terms, and is not embraced by the statute.
“ 4. That the defendants, being indorsers of the bill, and not ■the holders or owners at the time of protest, are not entitled to the damages, since they have not paid them.”
Being refused,--the judge stated to the jury, that “ these questions appear to me to have been determined by the Supreme Court of the United States in the present cause, in favor of the defendants ” ; and -further remarking, that, “ if I am mistaken in their views on this, it will be corrected by a reexamination of the cause in that court.”
That the judge was mistaken as regarded the questions arising on the third instruction, we have already stated ; but in regard to the fourth instruction, the charge was proper, as the question presented by it had been decided.
*397 Suppose, then, a bill of exchange could be drawn by the government of Maryland, or by the government of the United States in this District, as the successor of Maryland, on the government of France ; would the statute of Maryland give damages to a holder in case die' bill was dishonored by France,.and formally protested? The statute provides for damages upon all foreign bills drawn in that State, “ on any person, corporation, company, or society.”
Is the government of France either a person, corporation, company, or society, within the meaning of the act ? If it is, and was indebted, and could be drawn on and protested, then it follows that the drawer of the bill (in such an instance as this), on taking it up and- paying the damages, could, lawfully deinand from France, as drawee, the damages paid, and rightfully enforce the demand by the sword, if payment was refused ; as the demand would be a perfect right, and this the ultimate remedy. In our opinion, Maryland, by her act of 1785, never contemplate^ the idea that a foreign government should be subject to be drawn upon by bills of exchange, and to protest and damages as incidents, like individual persons, or trading companies, or corporations ; but that the statute had reference to the latter only ; and. that therefore this bill, on its face, “ is hot embraced by the statute,” in the language of the rejected instruction.
The second consideration arising on the instruction involves the structure and .character of the instrument, not so much in form, as in substance ; for the name. of the instrument cannot change its nature and character. The draft was drawn by one government on another, and of necessity accompanied by other documents, and the question is, was it a negotiable bill of exchange, in the legal meaning of the terms. The Circuit Court held that it was ; and. this is the-prominent legal point in the cause, or at least has been só treated at die bar, and on which this court has bestowed much consideration.
A bill of exchange is an instrument governed by the commercial law ; it must carry on its face its authority to command the money drawn for, so that the hojder, or the notary, acting as his agent, may receive the money, and give a discharge, on presenting the bill and receiving payment; or, if payment is refused,, enter' a protest, from, which follows-the incident of damages. But if no demand can be made on the bill standing alone, and it depends on other papers or documents to give it force and effect, and these must necessarily accompany the bill and be presented with it, it cannot be a simple bill of exchange, that circulates from hand to hand, as the representative of current cash.
The draft in question was drawn for 4,856,666.66 francs ; being moneys owing and shortly to become due from France to the United States, according to a treaty stipulation; and diese facts are distinctly set forth on the face of the draft, and by indorsements on it- *398 The paper was signed by ihe Secretary ef the Treasury of the United States, and addressed to the Minister and Secretary of State for the Department of Finance of the'kingdom of France, and was payable to the order of Samuel Jaudon, cashier, &c. The mere signature of our Secretary of the Treasury Could not be recognized by the French government as conferring-authority"on the holder to’ demand payment. The transaction being one ol nation with nation, he who demanded payment must have had not only the authority of this nation before he could have approached the French government, but that authority must have been communicated by the head of this government through the proper department carrying on .ouf national intercourse, which was the State Department. - Accordingly, of even date with the draft (7 February, 183g), an instrument was drawn up reciting the fact of indebtment, and cause thereof ; the amount due ; the authority conferred by an áct of Congress on' the Secretary of the Treasury to apply for the money in such manner as he might deem best; the fact and. manner of drawing for itand then comes the official authority to the payee to receive the money, in these’ terms : —
££ Now, therefore, be it known, that I, Andrew Jackson, President of the United States, do ratify and confirm, and approve the drawing of the said bill by the Secretary of the Treasury aforesaid,- and do hereby authorize- the said Samuel Jaudon, or his assignee of the said bill, to receive the amount thereof; and on receipt of the sum therein mentioned, to give' full receipt and acquittance to the government of France for the said first instalment, and the interest due on all the instalments, payable on the said second day, of February, by virtue of the said convention ; and I, Andrew Jackson, President as aforesaid, do hereby ratify and confirm all that may be lawfully done in the premises.
“ In testimony whereof, I have caused the seal of the United States to be hereunto affixed. Given under my hand, at the city of Washington, the seventh day of February, in [L. s.] the year one thousand eight hundred and thirty-three, and of the independence of the United States- of America the fifty-seventh. ’. T
AndR-ew Jackson,
£t By the President: Edw. Livingston,

Secretary of - State.”

This accompanied the draft, and was placed in the hands of the payee, and no doubt passed through the hands of the different indor-sees. "'Still, neither the power more than the draft could be-presented to the French government by a mere individual who was holder, or by a notary public, and therefore, on the next day after the draft and power bear date, the Secretary of State of our government addressed a despatch to. our charge d'affaires and representative at the French court, in the following terms :— 1
*399 “ Department of State, Washington, 8th February, 1833.
“ Nathaniel Niles, Esq. ,' Paris.
Sir :— The Secretary of the Treasury, in Conformity with the. provision of a law of the last session of Congress, yesterday drew a bill upon the Minister of State and Finance of fhe French government, for the first instalment and the1 interest thereupon, and for the interest upon the remaining-instalments ; which interest is stipulated to be paid by that government to this in twelve months from .the date of the exchange of the ratification of the late convention between the United States and his Majesty the King of-.the French'. The bill is drawn in favór of Samuel*Jaudon,. cashier of the Bank of the United States, or order, and will go accompanied, to the .assignee thereof in France, by a full power 'from the President, authorizing and• empowering hini, upon* the.due payment'of the same, to give the necessary receipt and acquittance to the French-government, . according to the provision of the convention referred to.
“ You will take an early opportunity, therefore, to apprize the French government of this arrangement.
“ I am,' Sir, respectfully, your obedient servant,
Enw. Livingston.7’
■ Until the French government was thus officially advised, die bill and accompanying power combined were valueless in the hands of the -holder, as- against France.
It follows, as we suppose, from the character, of the drawer and the drawee,' and the nature of the fund drawn upon, that this transaction could not be governed by the commercial law; much less by a statute of Maryland, which happened to be in force in. the District of Columbia, where the draft was drawn.
But it is insisted, and. with much plausibility, that as between the bank as payee, and .the United States as drawer, no such objections can be alleged by the United States ; they having assumed the draft to be a bill of exchange, and dealt with' it as commercial paperj are bound by the. assumption. Still, the question meets us, that no form of draft could authorize,a legal demand upon the drawee (France) on the face of the draft. So far from being á simple paper, carrying its authority to receive the. money with it, the parties now before the court conceded, at the time the drawing took place, by obtaining the power, that the right to receive the money did mainly depend, and must dépend, on the power signed by the President, and countersigned by the Secretary of State, with the seal of the United States attached, and the communication of the facts in official form, and through the proper channel, to the government of France, that is, through its-Department of Foreign Affairs. ■ These were • the conditions and contingencies with which the draft was encumbered. They were legal consequence's, apparent *400 on its face, and are yet more apparent by the accompanying facts that took place at the time of drawing.
Again. This controversy is between the .original parties ; the law governing the dealing, each was bound to know ; the facts they did know equally well; and if a mutual mistake was made in supposing that a negotiable commercial instrument could be founded on our claim against France, this mistake cannot change the commercial law, which in our opinion couid not be made to apply to the subject-matter of drawing, nor in any form of instrument' founded on the subject-matter.
The principal argument adduced to sustain the set-off claimed is founded on the fact, that by an act of Congress' the Secretary of the Treasury had a discretion to adopt any appropriate means to obtain the money, and that a bill of exchange was an appropriaté means. To this assumption it may be answered, that France was not bound by the act of Congtess, but by the treaty ; it stipulated, “ that the indemnity of twenty-five millions of francs should be paid, in six annual instalments, into the hands of such person or persons as should be authorized to receive it.” We repeat that this authority was to come from our government to the French government ; was to pass through the Department of State here, and through the Department of Foreign Afiairs there, and thus only could it reach the Minister of Finance, M. Humann. Our Secretary of the Treasury could not communicate with the Minister of .Finance, nor with any other functionary of the French government, and therefore the bill drawn by Mr. McLane on M. Humann, standing alone, was idle as waste paper, notwithstanding the act ,of Congress, in so far as the French government was concerned. Nor had M. Hu-mann any power to pay the money, had it been in the treasury, until instructed to do so by the Department of Foreign Affairs.
1. For these reasons-, we are of opinion that the question on the structure of the bill is an open question, because for the first'time presented to this court for decision.
2. That the statute of Maryland, of 1785, in its terms, does not embrace a bill of exchange drawn on a foreign government.
3. ■ That a bill of exchange in form, drawn by one government on another, as this was, is not, and cannot be, governed by the law merchant; and that therefore it is not subject to protest and consequential damages.
And on these grounds we order that the judgment of the Circuit Court be reversed, and that the cause be- rénaanded to that court for another trial thereof, on the principles stated in this opinion.
Mr. Chief Justice TANEY
filed the following memorandum : —
Thé Chief Justice withdrew from the bench in the argument of 'this case,'having given an official opinion, when he was Attorney-General of the United States, against the claim made by the *401 bank, and concurring altogether with the above opinion given by the court.